UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -  x
                                                             :
UNITED STATES OF AMERICA                                     :
                                                             :    S2 10 Cr. 798-03 (PAC)
         v.                                                  :
                                                             :
FABIO MOREL,                                                 :
    a/k/a "Fabian Luna,"                                     :
    a/k/a "Efrain Delvalle,"                                 :
                                                             :
                          Defendant.                         :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -  x

## GOVERNMENT'S SENTENCING MEMORANDUM

 

PREET BHARARA
United States Attorney
Southern District of New York
One St. Andrew's Plaza
New York, New York 10007

Aimee Hector/David Miller
Assistant United States Attorneys
     – Of Counsel –



U.S. Department of Justice

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York  10007*

May 29, 2012

**BY ECF AND HAND DELIVERY**

The Honorable Paul A. Crotty
United States District Court Judge
Southern District of New York
Daniel Patrick Moynihan United States Courthouse
500 Pearl Street
New York, New York 10007

    Re:    <u>United States</u> v. <u>Fabio Morel</u>, S2 10 Cr. 798-03 (PAC)

Dear Judge Crotty:

    The Government respectfully submits this letter in connection with the June 1, 2012 sentencing of defendant Fabio Morel, a/k/a "Fabian Luna," a/k/a "Efrain Delvalle," (the "defendant" or "Morel"), and in response to the defendant's May 22, 2012 sentencing submission ("Def Ltr."). As set forth herein, the Government believes that a Guideline's sentence of life imprisonment, as set forth in the Pre-Sentence Report ("PSR"), is reasonable and appropriate given the nature and seriousness of the offense.

**FACTUAL BACKGROUND**

**A.**    <u>**The Lopez Organization**</u>

    From at least 2002 through September 2010, Amaury Lopez Jr. ("Lopez Jr.") was the leader of a large-scale cocaine trafficking organization (the "Lopez Organization" or "Organization") that shipped hundreds of kilograms of cocaine from Puerto Rico to New York for distribution.[1] The Lopez Organization employed numerous individuals, including the

---

    [1] The information provided in the factual background discussed herein is derived from testimony and evidence admitted at trial. This information is also provided in the PSR from paragraphs 1 through 36.

The Honorable Paul A. Crotty
May 29, 2012
Page 2

defendant, who assisted the illegal drug-trafficking operation.  Lopez Jr. and his co-conspirators utilized both human couriers and the mails to accomplish their unlawful objectives.

Fabio Morel ("Morel") was Lopez Jr.'s right-hand man, and worked for Lopez Jr. in packaging narcotics and receiving drug proceeds in Puerto Rico and retrieving and distributing narcotics that had been shipped to the New York City area.  Lopez Sr. worked with Lopez Jr. in coordinating drug shipments from Puerto Rico and providing the drugs to Lopez Jr.'s distributors.  Maribel Lopez was involved in the Lopez Organization's shipment of money from the New York City area to Puerto Rico to pay for narcotics that would be shipped back.  Morel, Lopez Sr., and Maribel Lopez thus performed key functions for the Lopez Organization in the packaging, receipt and distribution of cocaine in the United States, and the handling of narcotics proceeds, much of which was transported back to Puerto Rico.  William Pozo ("Pozo") assisted Morel in distributing some of the Organization's narcotics.

Maribel Lopez and Pozo pled guilty prior to trial.  The Government filed a Prior Felony Information against Lopez Jr., Lopez Sr., and Morel prior to trial.  Trial commenced against Lopez Jr., Lopez Sr., and Morel before this Court on September 12, 2011 on Indictment S2 10 Cr. 798 (PAC), and concluded on September 21, 2011.  The Superseding Indictment charged that from in or about 2002 through in or about September 2010, the defendants conspired to distribute and possess with intent to distribute five kilograms and more of cocaine (Count One); Lopez Jr. and Morel were each charged with a substantive offense of distribution and possession with intent to distribute 500 grams and more of cocaine (Counts Two and Three), and Lopez Sr. was charged with attempting to distribute and possess with intent to distribute five kilograms and more of cocaine (Count Four).  On September 21, 2011, the jury found all three defendants guilty on all charges.

### B.     The Trial and the Evidence

The Government called 13 witnesses at trial, and introduced numerous exhibits proving the defendants' guilt, including documents and drugs seized over the course of the conspiracy.  Law enforcement witnesses and cooperating witnesses conclusively established the existence and operation of the Lopez Organization's cocaine business from in or about 2002 through in or about September 2010; how the Organization shipped and distributed cocaine and drug money; and how the business spanned from Puerto Rico to New York City.  The evidence showed that over the conspiracy period, the Lopez Organization sold and distributed at least 1,000 kilograms of cocaine.  Furthermore, the Government introduced numerous recorded conversations of the defendants discussing their narcotics activities, which proved the defendants' guilt through their own words.

At trial, the Government proved the facts set forth below concerning the operation of the Lopez Organization, its conduct and means, and the actions of the trial defendants, Lopez Jr., Lopez Sr., and Morel.

The Honorable Paul A. Crotty
May 29, 2012
Page 3

*How the Organization Operated*

The Lopez Organization operated by purchasing cocaine in Puerto Rico, which was then prepared for shipment to the United States via mailing services and in suitcases aboard airplanes. The cocaine was often secreted inside aluminum cans disguised as food products, among other methods of transport. Once the cocaine arrived in the United States, it was distributed to mid-level traffickers in the New York area. Sale of the Lopez Organization's cocaine resulted in profits of millions of dollars, which were collected by members of the Organization and then prepared for shipment back to Puerto Rico. Often, the U.S. currency was hidden inside vacuum-sealed bags or cans and transported to Puerto Rico via human couriers or through the mail.[2]

Lopez Jr. used other conspirators to secure cans, sealing machines, and stamping machines to transport cocaine and currency in his narcotics business. Some of the cans were from the Freund Container Supply Company (referenced below). At one point, Lopez Jr. also had another conspirator investigate and order candles, in which Lopez Jr. intended to ship cocaine.

*The Organization's Use of Violence and Weapons*

Members of the Lopez Organization used weapons and violence to maintain control of the Organization's workers, drug trafficking territory, and proceeds. Many members of the Organization carried firearms, including .40 caliber and 9 millimeter firearms and an Uzi, and possessed other paraphernalia, such as bullet proof vests. The evidence further demonstrated that the success and longevity of the Lopez Organization was owed primarily to Lopez Jr.'s reputation for violence. Lopez Jr. exerted control over his underlings through violence, fear, and intimidation, and exacted retribution on individuals who threatened the Organization either by theft or by cooperating with law enforcement.

Indeed, members of the Lopez Organization utilized those firearms when necessary to protect the Organization's profits. To this end, and as established at trial, in August 2004, Lopez Jr., Fabio Morel, a shooter named Carlito, and a cooperating witness killed an individual named Javier Sanchez because the Organization believed that Sanchez had stolen the cooperating witness's drug proceeds and threatened to steal proceeds belonging to Lopez Jr. The cooperating

---

[2] Notably, as introduced at trial, in a March 31, 2009 recorded conversation, Lopez Jr., Lopez Sr., and Morel discussed how they purchased cocaine in Puerto Rico and shipped it to New York for sale. (*See* Government Exhibit ("GX-") 700-T). As the Government showed at trial, this recording was essentially a primer on how the Lopez Organization operated its narcotics business.

The Honorable Paul A. Crotty
May 29, 2012
Page 4

witness had 9mm and Desert Eagle Smith & Wesson .40 caliber handguns and provided the .40 caliber to Lopez Jr. for the Sanchez murder.

The Government also introduced at trial evidence of another example of Lopez Jr.'s use of violence to protect his drug business. At one point, a cooperating witness (and fellow drug dealer) told Lopez Jr. that there was an unsuccessful robbery of his apartment where drug proceeds were stored. The dealer told Lopez Jr. that he saw a suspicious Nissan Murano vehicle parked nearby when this occurred. After being informed of the unsuccessful robbery, Lopez Jr. later believed a Nissan Murano had followed him and so Lopez Jr. fired a gun at the Nissan.

Furthermore, the evidence at trial showed that Lopez Jr. stored guns in his home in Englewood Cliffs, New Jersey, and in his Hummer, which had a secret compartment inside. Lopez Jr. shipped handguns from Puerto Rico by breaking them apart. Moreover, Lopez Jr. had an Uzi stored at his child's mother's home for protection. Similarly, as noted in a May 19, 2009 recorded conversation, Lopez Sr. admitted that he had maintained a gun and drugs in a safety deposit box. (*See* GX-901-T).

Notably, as the evidence at trial showed, Lopez Jr. would threaten any individual who spoke with law enforcement about the Organization's activities. By way of example, when Lopez Jr. found out that Pozo had been arrested and had spoken with law enforcement, he was furious and stated, in sum and substance, that Pozo's leg should be chopped off.

*Seizures of the Organization's Drugs, Guns, and Money*

Throughout the course of the conspiracy, law enforcement seized drugs, guns and money belonging to the Lopez Organization. Evidence was presented at trial establishing the facts set forth below.

December 30, 2002 Cash Seizure at JFK Airport

On December 30, 2002, approximately $130,000 U.S.C. contained in a vacuum-sealed bag was seized from carry-on luggage at JFK Airport. A courier told law enforcement that the money was from sale of a restaurant by courier's parents – a restaurant licensed to Theresa Flynn, one of Lopez Jr.'s girlfriends.

May 2005 Cash Seizure in Puerto Rico Post Office/UPS Store

In May 2005, approximately $365,000 U.S.C. contained in aluminum cans were seized at a Post Office/UPS store in Puerto Rico. The following pertinent facts concerning this seizure, among others, were established at trial:

- Morel attempted to pick up the money using a fake identification.

The Honorable Paul A. Crotty
May 29, 2012
Page 5

- UPS logs showed that Morel had been picking up packages at the store for over a year.
- Express mail receipts for those packages indicated the packages had been sent from the same non-existent Yonkers address (13 Knowles Street) that Lopez Jr. used when he bought his Hummer.
- In an interview with law enforcement, Morel admitted that he had been going to the UPS store since 2003.
- Morel admitted to lying about his identity.
- Prior to the seizure, a cooperating witness brought approximately $150,000 in narcotics proceeds to the Lopez residence at 357 North Broadway in Yonkers, New York. Lopez Jr. and Morel were already at the apartment. A short time later, Maribel Lopez arrived with an additional $180,000 in cash. The money was counted using a money counter. This money was packaged, sent to Puerto Rico, and seized.

<u>July 26, 2006 Seizure of Drugs, Guns, and Cash in the Bronx</u>

On July 26, 2006, approximately 7.8 kilograms of cocaine, 344 grams of heroin, 115 grams of crack, a scale/kilo press, two handguns, and U.S.C. were seized from a stash house on Gun Hill Road in the Bronx, New York. The drugs had been packaged in the hallmark of Lopez Organization (vacuum sealed in plastic bags with numbers on each half kilo). Furthermore, the apartment had been used by an individual (Jairo Tavarez) who was a Lopez Organization customer. Notably, the name "Amaury" was found in a drug ledger in the apartment.

<u>February 18, 2009 Drug Seizure at JFK Airport</u>

On February 18, 2009, approximately six kilograms of cocaine in aluminum cans were seized from two suitcases at JFK Airport. During the February 2009 recorded conversations introduce at trial, Lopez Sr. discussed finding someone to pick up the suitcases at JFK Airport.

The Honorable Paul A. Crotty
May 29, 2012
Page 6

### March 27, 2009 Drug Seizure at Yonkers Post Office

On March 27, 2009, approximately one kilogram of cocaine in an aluminum can was seized at a Post Office in Yonkers, New York.  The following pertinent facts concerning this seizure, among others, were established at trial:

- In or about March 2009, law enforcement officers conducted surveillance at the Yonkers Post Office after learning that an aluminum can containing approximately one kilogram of cocaine was shipped to the Post Office for pick up by a Lopez Organization co-conspirator, Jesus Soto.  (Law enforcement seized the package.).
- In the course of the surveillance, law enforcement officers observed Lopez Sr. arrive with Jesus Soto, and then circle the Post Office in an effort to conduct counter-surveillance.  Shortly thereafter, Lopez Jr. and Maribel Lopez arrived in another vehicle and also conducted counter-surveillance of the Post Office.  After Lopez Sr. dropped Soto off at the Post Office, Soto was arrested as he attempted to claim the package, and Lopez Sr., Lopez Jr. and Maribel Lopez sped off from the location.
- In a March 31, 2009 recorded conversation, Lopez Jr., Lopez Sr., and Morel spoke about getting Soto a lawyer.

### April 29, 2009 Drug Seizure at Bronx Hotel

On April 29, 2009, approximately four kilograms of cocaine were seized in the vicinity of the Van Cortlandt Hotel in the Bronx, New York.  The following pertinent facts concerning this seizure, among others, were established at trial:

- Lopez's cocaine was delivered to the hotel.  Morel was there.  Pozo arrived later. Law enforcement officers had the hotel under surveillance.
- The drugs were delivered inside cigar boxes with cigars clued on top, and those cigar boxes were contained in suitcases.
- The drugs were removed from the containers and Pozo left with them in a backpack.  Morel then tried to dispose of evidence of the four kilograms by throwing out the remaining trash.
- Pozo was arrested near the hotel after he left with the drugs.
- Morel was then arrested.

### September 9, 2010 Drug Seizure in the Bronx

On September 9, 2010, approximately 1.5 kilograms of cocaine were seized in the Bronx, New York.  In early September 2009, a cooperating witness and Lopez Jr. negotiated a 1.5

The Honorable Paul A. Crotty
May 29, 2012
Page 7

kilogram cocaine transaction.  (Recordings of these conversations were made.).  On September 9, 2010, the cooperating witness got 1.5 kilograms from a Lopez Jr. worker, provided it to law enforcement, and thus was not able to pay Lopez Jr. for the product.   Lopez Jr. was angered by the lack of payment, and continued to harass the witness for the money.  Lopez Jr. made clear that he is "the one who gives orders here."  (GX-707-T).

*Lopez Jr. Is Arrested*

On October 6, 2010, Lopez Jr. was arrested.  In his vehicle was a catalogue from the Freund Container Supply Company addressed to "Maribel Lopez" at the 357 North Broadway address referenced at trial. As described above, trial evidence demonstrated that hundreds of aluminum cans were purchased by the Lopez Organization from the Freund Container Supply Company to secret both cocaine and money for shipment to and from Puerto Rico.  Furthermore, at his arrest, Lopez Jr. had in his possession an April 29, 2009 surveillance video of the Van Cortlandt Hotel – the same night that approximately four kilograms of cocaine were seized and where Morel and Pozo were arrested.

## APPLICABLE LAW

The advisory Sentencing Guidelines promote the "basic aim" of Congress in enacting the Sentencing Reform Act, namely, "ensuring similar sentences for those who have committed similar crimes in similar ways."  *United States v. Booker*, 543 U.S. 220, 252 (2005).   Thus, the Guidelines are more than "a body of casual advice, to be consulted or overlooked at the whim of a sentencing judge."  *United States v. Crosby*, 397 F.3d 103, 113 (2d Cir. 2005).  The applicable Sentencing Guidelines range "will be a benchmark or a point of reference or departure" when considering a particular sentence to impose. *United States v. Rubenstein*, 403 F.3d 93, 98-99 (2d Cir. 2005).  In furtherance of that goal, a sentencing court is required to "consider the Guidelines 'sentencing range established for . . . the applicable category of offense committed by the applicable category of defendant,' the pertinent Sentencing Commission policy statements, the need to avoid unwarranted sentencing disparities, and the need to provide restitution to victims." *Booker*, 543 U.S. at 259-60 (citations omitted).

Along with the Guidelines, the other factors set forth in Section 3553(a) must be considered.  Section 3553(a) directs the Court to impose a sentence "sufficient, but not greater than necessary" to comply with the purposes set forth in paragraph two.  That sub-paragraph sets forth the purposes as:

> (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>
> (B) to afford adequate deterrence to criminal conduct;

The Honorable Paul A. Crotty
May 29, 2012
Page 8

>   (C) to protect the public from further crimes of the defendant; and
>
>   (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner. . . .

Section 3553(a) further directs the Court – in determining the particular sentence to impose – to consider: (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the statutory purposes noted above; (3) the kinds of sentences available; (4) the kinds of sentence and the sentencing range as set forth in the Sentencing Guidelines; (5) the Sentencing Guidelines policy statements; (6) the need to avoid unwarranted sentencing disparities; and (7) the need to provide restitution to any victims of the offense. *See* 18 U.S.C. § 3553(a).

The Second Circuit has instructed that district courts should engage in a three-step sentencing procedure. *See Crosby*, 397 F.3d at 103. First, the Court must determine the applicable Sentencing Guidelines range, and in so doing, "the sentencing judge will be entitled to find all of the facts that the Guidelines make relevant to the determination of a Guidelines sentence and all of the facts relevant to the determination of a non-Guidelines sentence." *Crosby*, 397 F.3d at 112. Second, the Court must consider whether a departure from that Guidelines range is appropriate. *Id.* Third, the Court must consider the Guidelines range, "along with all of the factors listed in section 3553(a)," and determine the sentence to impose, whether it be a Guidelines or non-Guidelines sentence. *Id.* at 113. In so doing, it is entirely proper for a judge to take into consideration his or her "own sense of what is a fair and just sentence under all the circumstances." *United States v. Jones*, 460 F.3d 191, 195 (2d Cir. 2006).

## DISCUSSION

As discussed below, the Government respectfully submits that after applying the sentencing factors to Morel's conduct, a Guidelines sentence is clearly warranted.

### A.    Application of the Sentencing Guidelines

The applicable sentencing guideline to the offenses charged in Count One and Count Three (against Morel only) is U.S.S.G. § 2D1.1. (PSR ¶ 41). Pursuant to Section 3D1.2(d), Counts One and Three are grouped together because the offense level is determined largely on the basis of the quantity of the substance involved. (PSR ¶ 40). Under Section 2D1.1, the defendant's base offense level is 38 (§ 2D1.1(c)(1)) and, because a dangerous weapon was possessed during the offense and violence was employed, four levels are added (§ 2D1.1(b)(1) & (2)), resulting in a total offense level of 42. (PSR ¶¶ 41-42). Pursuant to § 2D1.1(d)(1), however, because a victim was killed under circumstances that would constitute first degree

The Honorable Paul A. Crotty
May 29, 2012
Page 9

murder under 18 U.S.C. § 1111, reference to the murder guideline at § 2A1.1 is warranted and results in an increased offense level of 43. (PSR ¶¶ 41). As noted in the PSR, Morel has five criminal history points and is in Criminal History Category III (PSR ¶¶ 55-68), which results in a Guidelines range of life imprisonment, with a mandatory minimum term of 20 years imprisonment (pursuant to the filing of the Prior Felony Information). (PSR ¶¶ 93-95).

Although no longer binding upon the Court, the Guidelines sentence of life imprisonment appropriately reflects the seriousness of Morel's offense and is reasonable and appropriate in light of the nature and scope of Morel's criminal conduct.

**B.      The Section 3553(a) Factors**

A Guidelines sentence for Morel is appropriate pursuant to the factors set forth in 18 U.S.C. § 3553(a). First, the nature and circumstances of the offense clearly warrants a Guidelines sentence. As the PSR notes, Morel was a long-standing, key participant in the Lopez Jr. cocaine distribution Organization, effectively functioning has Jr.'s right-hand man throughout the course of the conspiracy. Beginning in the early 2000s, Morel established himself as a trustworthy confidant to Lopez Jr. and was entrusted with some of the Organization's most important tasks. Morel traveled to Puerto Rico with Jr. and other members of the Organization, where he packaged hundreds of bricks of cocaine for shipment to the New York area. Morel also facilitated the receipt of narcotics proceeds in Puerto Rico by opening mailboxes under fictitious names and retrieving concealed funds, as evidenced by the 2005 seizure of $365,000 at a Post Office in Puerto Rico and accompanying mailing records. In New York, Morel would receive multi-kilogram loads of cocaine for distribution to customers and collect payments for the product. These activities lasted nearly a decade at least, and were not only integral to the success of the Organization, but also lucrative for Morel himself.

Moreover, as proven at trial, and as discussed above, the Lopez Organization was a violent organization that used weapons, threats, and fear to protect their narcotics business. Credible evidence at trial demonstrated that Morel was an active participant in the Organization's violence as well, performing a key role in the murder of Javier Sanchez, who threatened to steal from Lopez Jr.. Morel participated in the homicide as the getaway driver who shuttled the shooter from the scene of the murder to JFK airport, for a quick escape to Puerto Rico.

In sum, Morel's criminal conduct was extensive in scope and duration, and contributed to the successful distribution of hundreds of kilograms of cocaine by a violent criminal organization.

Second, the history and characteristics of the defendant and the need to "afford adequate deterrence to criminal conduct," 18 U.S.C. § 3553(a)(2)(B), further support a Guidelines sentence. As the PSR indicates, Morel's involvement in the narcotics business began when he

The Honorable Paul A. Crotty
May 29, 2012
Page 10

was 20 years old. Despite serving a ten year sentence for a narcotics conviction in 1991, Morel continued to deal drugs following his release. In fact, he began working for Lopez Jr. shortly thereafter. Morel incurred his second criminal conviction, which is related to the instant offense, in July 2006. Morel was arrested in a vehicle with Lopez Jr. after the two picked up $60,000 in narcotics proceeds. Once again, however, incarceration failed to have any impact on his post-release conduct. As evidenced at trial, Morel continued to work for Lopez Jr. following his release. Clearly, even significant prison sentences have failed to deter Morel from re-engaging in criminal conduct. Rather, his involvement in narcotics trafficking, and violence, has only escalated. Accordingly, a Guidelines sentence is appropriate to deter Morel and other persistent narcotics traffickers from continuing to engage in such criminal conduct.

### C.     Defendant's Sentencing Submission

Morel raises several arguments relevant to his sentencing, none of which have any merit and none of which are supported by case law.

First, Morel claims that the murder guideline under § 2D1.1(d) should not apply because "he was never convicted of, or charged with, murder" and it would be a "complete denial of due process" to enhance his sentence on the basis of this uncharged crime. (Def. Ltr. 2). Despite Morel's contentions, however, the application of § 2D1.1(d) does not require that the defendant be charged with the underlying murder. Rather, under Second Circuit precedent, this Court may apply the murder guidelines adjustment pursuant to § 2D1.1(d) if it finds, based on a preponderance of the evidence, that a victim was killed in connection with the offense under circumstances that would constitute premeditated murder. *United States v. Cordoba-Murgas*, 233 F.3d 704, 709 (2d Cir. 2000) (finding preponderance of evidence standard applies when consideration of adjustment under § 2D1.1(d)(1)); *see also United States v. Todd-Murgas*, 352 Fed. Appx. 513, 515 (2d Cir. 2009); *United States v. Westmoreland*, 240 F.3d 618 (7th Cir. 2001) (holding that § 2D1.1(d) did not violate defendant's constitutional rights or *Apprendi* because section cannot act to enhance sentence beyond the statutory maximum associated with the crime of which defendant was convicted). This Court should apply the murder adjustment because, as discussed more fully above, the evidence at trial demonstrated that Morel and the Lopez Organization planned and carried out the murder of Javier Sanchez in order to further the Organization's criminal objectives.

Second, Morel claims that the enhancement for possession of a firearm pursuant to §2D1.1(b)(1) is inapplicable because there was "no testimony at trial indicating that Fabio Morel shot, brandished or possessed a firearm." (Def. Ltr. 3). As Morel readily admits, however, such evidence is not required. Second Circuit case law, some of which was cited by the defendant, holds that the weapons enhancement applies if a weapon was connected with the offense, even if the defendant did not have "personal possession, or even actual knowledge of the weapon's presence" as long as "possession of the firearm was reasonably foreseeable to the defendant." *United States v. Soto*, 959 F.2d 1181, 1186 (2d Cir. 1992); *see also United States v. Stevens*, 985

The Honorable Paul A. Crotty
May 29, 2012
Page 11

F.2d 1175, 1188 (2d Cir. 1993).  Such is clearly the case here.  There was ample testimony concerning the Organization's possession of weapons, including, *inter alia*, a Desert Eagle, 9 millimeter and Uzi firearm.  Lennyn Mendez testified that Lopez Jr. kept firearms in multiple locations for use in the Organization, including cars and houses.  Further, handguns and bullets were seized from the Gun Hill Road apartment utilized by members of the Organization and numerous recorded conversations made reference to weapons and violence perpetrated by the Organization.  Finally, trial testimony established that the Lopez Organization used firearms to further the aims of the conspiracy, including the murder of Javier Sanchez, in which Morel was a key participant.  Given such evidence, it strains credulity to suggest that the possession of firearms by the Organization was not foreseeable to the defendant, even absent direct evidence that he possessed them.  In fact, the sheer volume of money and narcotics transported and distributed by the Organization alone would be enough to suggest that the presence of firearms was reasonably foreseeable, as such instruments are widely recognized tools of the drug trade.  *See United States v. Kimberlin*, 18 F.3d 1156, 1160 (4th Cir. 1994).

Third, Morel contends that § 2D1.1(b)(2) is inapplicable because he never engaged in violence or threats of violence during the course of the conspiracy.  Again, defendant is incorrect.  Lennyn Mendez testified credibly regarding Morel's direct participation in the successful murder plot against Javier Sanchez.  As noted above, this Court need only find Morel's participation in acts or threatened acts of violence by a preponderance of the evidence.

Fourth, Morel claims that his offense level should be reduced by two points pursuant to §3B1.2(b) because he was a "minor participant" in the narcotics conspiracy who acted solely as a "mule" or "courier."  (Def. Ltr. 4).  The defendant's characterization grossly understates his role in the offense and the applicability of the adjustment.  As noted in the Guidelines Application notes and relevant case law, the application of a minor role adjustment is a fact-based analysis and is available only when the defendant is substantially less culpable than the average participant in a criminal activity.  *See United States v. Yu*, 285 F.3d 192, 200 (2d Cir. 2002).  The factual analysis turns on such considerations, *inter alia*, as the defendant's lack of knowledge of the scope of the scheme or its structure, lack of personal gain, amount of drugs distributed, and the time period involved.  *See id.*; *see also United States v. Garvey*, 905 F.2d 1144 (8th Cir. 1990) (quantity of drugs considered); *United States v. Garcia*, 580 F.3d 528 (7th Cir. 2009) (noting that defendant not minor participant when entrusted by network's leaders to transport money and drugs on multiple occasions).  As described above, Morel's role in the charged narcotics conspiracy was wide-ranging and extensive.  He performed various functions that were only performed by trusted members of the Organization, such as the collection of money and the packaging of narcotics in Puerto Rico.  He also opened mailboxes for the receipt of drug proceeds and collected those packages over a period of many years.  In fact, not only did he perform almost every necessary role in a narcotics distribution organization, he participated in the Organization for an exceedingly long time period, at least nearly a decade.  Far from acting as a lowly courier or mule, he was a Lopez family confidant and integral member of the Lopez Organization.

The Honorable Paul A. Crotty
May 29, 2012
Page 12

      Finally, Morel argues that this Court should reduce his sentence by the amount served for his 2006 money laundering conviction because the money he was laundering were Lopez Organization narcotics proceeds and thus it would be "unfair to punish Morel twice for the same criminal activity." (Def. Ltr. 4). In support, Morel cites *United States v. Rosado*, 2003 U.S. Dist. LEXIS 7734, at *8 (S.D.N.Y. May 8, 2003). This Court should find that such a reduction is not warranted for the same reasons Judge Scheindlin concluded it was not warranted in *Rosado*. First, as was the case in *Rosado*, Morel's conduct with respect to the money laundering offense had no impact on the determination of his guidelines offense level in this case.[3] 254 F. Supp. 2d at 8. Second, also as in *Rosado*, Morel was not charged with money laundering in the federal Indictment and the state money laundering offense "was an offense separate from the federal charges and justified an additional penalty imposed by the state court." *Id*. at 9. Finally, despite Morel's citation to *United States v. Kiefer*, 20 F.3d 874 (8th Cir. 1994), the provisions of U.S.S.G. § 5G1.3 do not apply because, *inter alia*, Morel is not serving an undischarged term of imprisonment for the money laundering offense.

---

[3] Morel's 2006 attempted money laundering conviction was also excluded from the calculation of his criminal history score.

The Honorable Paul A. Crotty
May 29, 2012
Page 13

## CONCLUSION

       For the reasons set forth above, the Government respectfully submits that Morel's crimes are appropriately penalized in the Guidelines. Accordingly, the Government requests that the Court impose a life sentence, as it is sufficient but not greater than necessary to serve the legitimate purposes of sentencing.

Respectfully Submitted,

PREET BHARARA
United States Attorney

By:        /s/
Aimee Hector/David Miller
Assistant United States Attorneys
Tel.: (212) 637-2484/-2203

cc:    Mr. John Burke, Esq. (by email)